No. 1497.—Succession of JEAN JOURNE, on a rule taken on the Tutrix and Under Tutor.

The good will of a stall or stand in the public market places of the city of New Orleans is something independent of the stand itself and belongs to the party who leases the stall or stand.
If a lessee of a market stall or stand dies, the property in the good will of the stand falls into his succession.

APPEAL from the Second District Court of New Orleans. *Thomas*, J. *Budd & Murphy*, for appellee. *Saucier & Michinard*, for appellant.

TALIAFERRO, J. In this case a paternal uncle offered the account and tableau of the tutrix of his deceased brother's minor children on the ground that, to the minor's injury the tutrix had failed to place upon her inventory and account an item of $1700, money which, in part, she should have accounted for as belonging to the minor. This claim of the opponent set up in the interest of the minor is founded on the following state of facts. Jean Journé, husband of the tutrix and father of the minor, was by occupation a butcher, and occupied for some time previous to his death, which happened in the latter part of August, 1866, a stand or stall in one of the markets of the city for vending butcher's meat. During his last illness and after his decease the stall was occupied by a man in attendance, and the charges or dues were paid by Bernard Delord, a brother of the tutrix, also a butcher occupying a stall of his own in the same market. About three month's afterward Delord sold out the privileges and use of the stall to Victor Bowras for $1700 and appropriated the money to his own use. The opponent contends that the proceeds of this sale rightfully belong to the community that existed between the tutrix and Jean Journé. It does not appear that the tutrix ever claimed anything on this account, or that she ever received any of the money arising from the sale made

by Delord.    It is held in defense that the succession can hold no right whatever to the use or the privileges of the stall occupied by Journé in his lifetime; that the obligation was one strictly personal as to him and not heritable; that at his decease the right of the city, through its agents, to rent the stall to any applicant instantly arose; that Delord obtained the use and privileges of the stall from one of the farmers, as they are termed, of the market stalls, and that he is in no manner affected by any pretended right claimed for the succession.

It seems that there exists a custom or common usage in dealing in these matters, of transferring, by consent generally of the farmer, the use of market stalls, and with that transfer of selling the "good will" also of the stand, by which is understood the run of custom which the transferrer had attained by the patronage of his friends resorting to his stand to purchase, and generally from the reputation his stand had acquired as one at which good and wholesome meats were sold, and where customers were accommodated and fairly dealt with.    When Jean Journé obtained the stand he gave $1350 for the "good will," and Delord sold the "good will" for $1700.    The good will is a thing strictly belonging to the party leasing from the city, and with which neither the city nor its farmers or agents have anything to do.

On the trial of the case in the lower court the judge gave judgment in favor of the opponent, ordering the tutrix to place the sum of $1700 upon the inventory of the succession, the value of the stall, this sum belonging to the community, one-half to the tutrix in her own right and the other to her minor children.    After an unsuccessful effort to obtain a new trial the tutrix took an appeal.

If the lease terminated at the death of Journé, and his widow and heirs had no right to continue and use the stall, what is called the "good will" was something they were entitled to, if it could not be made available, and we are not sure that it could not have been.    This equitable right did not cease to exist because it was not practicable to derive benefit from it.    But what rights did Delord acquire subsequent to the decease of Journé?    His whole course in relation to the matter after the decease of Journé seems not to have been of that clear and straightforward character which would have rendered his intentions manifest.    Journé's partner in the purchase of beeves, etc., for the market, engaged a man to attend the stall during the last illness of Journé to avoid a forfeiture of the lease which, by a city ordinance, would have terminated had three days passed without an attendant at the stall. During this period Delord paid the required dues to the farmer as they became exigible, and did this for Journé.    After Journé's death, Delord continued to pay the dues, in whose right does not seem entirely clear. Negalona, an agent or representative of the farmer, testifies that he gave orders to his collector to give possession of the stall to Delord, and that Delord paid dues for himself and not for the succession.    He

says also that he paid the dues but did not take possession, that a young man named Paul occupied the stall, that he did not know for whom he occupied it. He said that according to the *custom* of the market the stall belonged to the farmer when the occupant died, and afterward when interrogated as to how he knew such to be the custom he replied that he knew nothing of *customs* that he claimed under the ordinances. This is the most important witness on the part of the defense, and we can not but think his testimony vague and unsatisfactory. He gives no clue as to the time when he authorized Delord to take possession of the stall, and leaves us equally in the dark as to when he ceased to pay dues on account of others, and when he began to pay them for himself—an important fact in the case. On the other hand it is sufficiently clear that his manner was such as to induce others to suppose that he was paying these dues for the benefit of the estate of his brother-in-law. Paul was in attendance at the stall, but neither Negalona, who says he authorized Delord to take possession of it, nor, as far as shown, any other person knew for whom Paul was occupying. Bowras, who bought from Delord, was induced to believe that Delord was acting in behalf of the widow of Journé, for Bowras proposed going to see the widow in relation to the transfer, but was told by Delord that it was not necessary, leaving the impression that he was authorized to act, but he did not tell him that he was the owner. Bowras, in his testimony in the case, says that Delord never occupied the stall for himself. It is well established that Delord never had possession of the stall personally. He never complied with one of the important requirements of the city ordinances, that of posting up his name over the stall. In getting this dubious control of the stall he gave nothing to anybody for " good will," but after the period of about three months he suddenly transferred the stall to Bowras, and sold him the " good will " for $1700.

Now, what good will did he sell? It was not that of his own stall in the same market where he continued to pursue his occupation. During his quasi management of the stall, formerly Journé's, for the brief period of three months without having posted his name over the stall, as required by the city ordinance, and never occupying it himself in person, he could not have acquired on his own account any appreciable amount of additional patronage or good will for that stall. But it is said that upon the death of Journé the good will that appertained to his stall ceased, and that nothing of the kind could have gone to his heirs. This position is not tenable. It is not exclusively to the person that what is termed the " good will " is attached, but it is chiefly to the place. The patronage and custom bestowed upon this stall was estimated to be worth $1350 when Journé got it, and he paid the $1350 for the good will. This belonged to him at his death, and upon principles of equity at least it should, if practicable, be made available for his

minor children, at all events their half of it. If the mother and tutrix thought proper to waive and decline her own rights in the premises, she certainly was not justifiable in sacrificing those of the minors.

. From these considerations we conclude that the judgment appealed from was properly rendered.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be affirmed, with costs in both courts.